UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

---

H-D MICHIGAN, INC.,
HARLEY-DAVIDSON MOTOR
COMPANY, INC.,

        Plaintiffs,

        v.                              Case No. 04-C-0533

TOP QUALITY SERVICE, INC.,

        Defendant.

---

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

On June 4, 2004, plaintiffs, H-D Michigan, Inc., and Harley-Davidson Motor Company, Inc., (Harley), sued defendant, Top Quality Service, Inc., (TQSI), for trademark infringement, unfair competition and false designation of origin. Before the court is defendant's motion for summary judgment.

**FINDINGS OF FACT**

Plaintiffs make the Harley-Davidson motorcycles and offer other motorcycle-related products and services. On the other hand, TQSI organizes and promotes motorcycle rallies on cruise ships. While TQSI targets all motorcycle enthusiasts, the majority of its customers are Harley enthusiasts. (Def.'s Br. in Supp. Ex. 32 at 28-29.) TSQI promotes its events (1) at motorcycle rallies, including Harley rallies, (2) in magazines for Harley and other motorcycle enthusiasts, such as "Iron Works," "American Iron, "Hot Bike," and "Robb Report Motorcycling"; (3) in brochures; and (4) on the TSQI website. (Def.'s Br. in Supp. Ex. 8 ¶¶ 15, 17.) TSQI cruise passengers may not bring motorcycles

to the rallies. (Bryner Decl. Ex. A at 28-29.) However, various vendors – including Harley vendors – bring motorcycles and other related merchandise on board. (Def.'s Br. in Supp. Ex. 7 at 114-15.)

TQSI's first and second annual cruise leaflets do not contain a disclaimer that TQSI is unaffiliated with Harley. (Def.'s Br. in Supp. Ex. 28.) Moreover, the leaflet for the first cruise states that it is a "Harley Owners' Cruise Rally," while the leaflet for the second cruise states that it is a "Harley Riders' Rally." (*Id.*) However, the bottom of the leaflet for the first cruise contains the contact information stating that the organizers are Dean & Debbie Anderson, Independent Cruise Specialists. (*Id.*) Additionally, TQSI's logo is displayed prominently on every page. (*Id.*) Further, at the bottom of the leaflet for the first cruise are over a dozen vendor logos, with the Harley logo among them. (*Id.*) Finally, the leaflet for the second cruise displays prominently TQSI's logo with its web address and phone number on the bottom. (*Id.*)

Subsequent cruise announcements contain no mention of Harley and disclaim explicitly an association with Harley. (*Id.*) Additionally, TQSI's website, dating back to 2003, contains a similar disclaimer or otherwise indicates through its content that TQSI is unaffiliated with Harley. (*Id.* Ex. 28, 32 at 28.) For example, the website for the first annual cruise contains an "About Us" page, dated September 30, 2003. (Compl. Ex. 15.) The page tells the story of Dean and Debbie Anderson, how they came up with the idea of a motorcycle cruise, and what awaits cruise passengers on board. (*Id.*) The signature of the bottom of the page reads "Dean and Debbie Anderson" and states their Virginia address and phone number. (*Id.*)

2

Case 2:04-cv-00533-LA    Filed 08/31/06    Page 2 of 11    Document 84

Similarly, the website for the second annual cruise contains an FAQ page explicitly disclaiming TQSI's affiliation with Harley. (*Id.* Ex. 16.) The website contains a "Giveaway" page stating that a 2003 giveaway motorcycle was donated by Dean and Debbie Anderson. Further, the "Grand Prize Motorcycle" section of the "Giveaway" page states, "For the 2004 Hog On The High Seas Rally we are trying to determine what motorcycle we (Dean & Debbie) will be purchasing for this years (sic) giveaway. It could be the 2003 Harley-Davidson Road King Custom Pictured below." (*Id.*)

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Id.* at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend its case. *Id.* at 322-24.

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The mere existence of some factual dispute does not defeat a summary judgment motion, however; there must be a *genuine* issue of *material* fact for the case to survive. *Id.* at 247-48.

"Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997).

3

Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. A "genuine" issue of material fact requires specific and sufficient evidence that, if believed by a jury, would actually support a verdict in the nonmovant's favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

II. Trademark Infringement Claim

To prevail on a trademark infringement claim, plaintiffs must prove "(1) that its trademark may be protected and (2) that the relevant group of buyers is likely to confuse the alleged infringer's products or services with those of plaintiff." *Forum Corp. of North America v. Forum, Ltd.*, 903 F.2d 434, 439 (7th Cir. 1990). Defendant argues that under *Harley-Davidson, Inc. v. Grotanelli*, 164 F.3d 806 (2d Cir. 1999), the term "hog" is generic and not entitled to legal protection. (Def.'s Br. in Supp. 11-12.) Further, defendant submits that it used the term "HOGS" in the cruise name "HOGS ON THE HIGH SEAS" in its generic sense. (*Id.* at 16-17.) Finally, defendant contends that, because the term "hog" is generic, the likelihood of confusion factor is irrelevant. (*Id.* at 16-18.)

The court must decide whether there is a genuine issue of material fact with respect to two issues: (1) whether Harley's mark "HOG" in the context of TQSI's use is protectible; and (2) if so, whether there is a likelihood of confusion between plaintiffs' and defendant's use of the term "HOG."

In *Harley-Davidson, Inc. v. Grotanelli*, the Second Circuit has held that the term "hog" is generic and declined to enjoin defendant "from using 'hog' to identify his

4

motorcycle products and services." 164 F.3d at 812. One of Grotanelli's motorcycle services was an event called "Hog Holidays" or "Hog Farm Holidays."[1] *Id.* at 809. According to Grotanelli, "Hog Holidays" are motorcycle rallies where participants arrive in motorcycles, automobiles, campers, etc. (Grotanelli Decl. ¶¶ 6-7.) Similarly, defendant organizes cruise rallies called "Hogs on the High Seas" for motorcycle enthusiasts where motorcycle vendors feature their various products, including motorcycles. (Def.'s Br. in Supp. 3.) For those reasons, defendant argues that its use of the term "hog" is similar to that of Grotanelli's, which was upheld by the Second Circuit. (*Id.* at 3-15.)

The parties agree that the Second Circuit held the term "hog" to be generic. On the other hand, the dispute is whether the holding binds Harley through the doctrine of issue preclusion. Issue preclusion applies when "(1) the issue sought to be precluded is the same as that involved in the prior action; (2) the issue was actually litigated; (3) the determination of the issue was essential to the final judgment; and (4) the party against whom estoppel is invoked was fully represented in the prior action." *Havoco of Am., Ltd. v. Freeman, Atkins & Coleman, Ltd.*, 58 F.3d 303, 307 (7th Cir. 1995).

Defendant contends that *Grotanelli* held that "hog" is generic, and TQSI uses the term in its generic sense, "meaning motorcycles." (Def.'s Br. in Supp. 16-17.) Conversely, plaintiffs argue that *Grotanelli* is inapplicable, because (1) the term "hog" is different from the acronym "H.O.G.," which refers to people belonging to Harley Owners'

---

[1] Another similarity between Harley's and Grotanelli's use of the word "hog" is that they both publish a motorcycle newsletter containing the term. Harley's publication is titled "Hog Tales," (Compl. ¶ 16.) while Grotanelli's is titled "The Hog Farm Report." (Grotanelli Decl. ¶ 11.) Grotanelli's use of the term "hog" in his newsletter was upheld by the Second Circuit. *Grotanelli*, 164 F.3d at 810. Harley does not explain why it is permissible to use the term "hog" in connection with the newsletter but not in connection with a cruise rally.

5

Group; and (2) defendant uses the term "hog" to describe cruise passengers, not motorcycles. (Pls.' Br. in Opp'n 6-11.)

From the plain reading of *Grotanelli*, it is apparent that the holding pertains to any use of the term "hog," including the acronym "H.O.G.," when "hog" is used in relation to "motorcycle products *or services*." *Grotanelli*, 164 F.3d at 812 (emphasis added). The *Grotanelli* court specifically mentioned that the term "H.O.G." stands for the Harley Owners' Group. *Id.* at 809. In holding that "hog" is generic, the court did not single out the "H.O.G." mark as non-generic because it refers to people rather than motorcycles. To the contrary, it mentioned the "H.O.G." mark as part of Harley's illegitimate efforts to exclude the term "hog" from the generic pool. *Id.* The Second Circuit stated that

> In 1981, Harley-Davidson's new owners recognized that the term "hog" had financial value and began using the term in connection with its merchandise, accessories, advertising, and promotions. In 1983, it formed the Harley Owners' Group, *pointedly using the acronym "H.O.G."* In 1987, it registered the acronym in conjunction with various logos. It subsequently registered the mark "HOG" for motorcycles. That registration lists Harley-Davidson's first use as occurring in 1990.

*Id.* (emphasis added). Thus, the *Grotanelli* court was aware of (1) the "H.O.G." mark; and (2) that the acronym denoted members of Harley Owner' Group rather than motorcycles. Nevertheless, the court made no distinction between Harley's application of the term "hog" to large motorcycles and to H.O.G. members. *Id.* Finally, Grotanelli was allowed to continue promoting the "Hog Holiday" rally and to publish the "Hog Farm Report," *Id.* at 810, thus negating plaintiffs' assertion that defendant's use of the term "hog" falls outside *Grotanelli*. For that reason, *Grotanelli*'s holding that "hog" is a generic term binds Harley through the doctrine of issue preclusion.

6

Next, plaintiffs argue that its rights in the "H.O.G." marks are stronger now than they were at the time of *Grotanelli*, because they have expanded and strengthened the mark since the decision. (Pls.' Br. in Opp'n 5-7.) Further, plaintiffs contend that some of their "HOG" marks have become incontestable pursuant to Lanham Act §15, 15 U.S.C. §1065. (Pls.' Br. in Supp. 4.)[2] In support of this assertion, plaintiffs offer the initial and supplemental declarations from Linda A. Heban. (*Id.* at 5.) Unfortunately for plaintiffs, both of Heban's declarations fail to comply with Fed. R. Civ. Pro. 56(e)'s requirements of personal knowledge and admissibility of evidence. For that reason, neither declaration may be considered in deciding motions for summary judgment.[3] Without the declarations, there is no evidence in the record to overcome defendant's arguments that Harley's "HOG" mark is generic in light of *Grotanelli*.

Nevertheless, even if plaintiffs' Heban declarations were admissible in evidence, defendant still would have prevailed. Plaintiffs may not strengthen or otherwise validate a generic mark. *Miller Brewing Co. v. Jos. Schlitz Brewing Co.*, 605 F.2d 990, 994 n.7 (7th Cir. 1979). Likewise, Lanham Act §15(4) states that "no incontestable right shall be acquired in a mark which is the generic name for the goods or services or a portion thereof, for which it is registered." 15 U.S.C. §1065(4); *see also* 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* §12:60 (4th ed. 1996) (stating that

---

[2] Plaintiffs' brief in support of its motion for summary judgment is incorporated by reference into the brief in opposition to defendant's motion for summary judgment (Pls'. Br. in Opp'n 1.)

[3] Heban's declarations state that they are based on "personal knowledge, . . . knowledge [she had] derived from a review of the records and files maintained in the ordinary course of business by Harley, or upon information supplied to [her] by other employees or agents of Harley . . . ." (Heban Decl. ¶ 1; Heban Suppl. Decl. ¶ 1.) For a more comprehensive explanation of Fed. R. Civ. Pro. 56(e)'s requirements, see the decision and order denying plaintiffs' motion for summary judgment (Doc. # **xx**).

7

"incontestibility is never a shield for a mark that is generic"). Thus, no matter how much effort Harley has invested in strengthening its "HOG" mark, it remains generic, and, as such, can never attain the status of incontestability.

In light of this court's conclusion that the mark "H.O.G." is not protectible, there is no need to reach the issue of the likelihood of confusion.

III.     Federal Unfair Competition and False Designation of Origin Claims

In addition to trademark infringement, plaintiffs assert unfair competition and false designation of origin claims. Courts have held that "if a term was generic, use of that term alone could not give rise to an unfair competition claim, even if many people had come to associate the term with the plaintiff." *Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 939 (7th Cir. 1986). However, "an unfair competition claim might be supportable if consumer confusion or a likelihood of consumer confusion arose from the failure of the defendant to adequately identify itself as the source of the product." *Id.*

Plaintiffs assert that defendant has not "adequately identified itself as the source of the product." *Id.* To be sure, the first and second TSQI cruise leaflets do not disclaim a sponsorship by Harley. (Def.'s Br. in Supp. Ex. 28.) Moreover, the leaflet for the first cruise states that it is a "Harley Owners' Cruise Rally," while the leaflet for the second cruise states that it is a "Harley Riders' Rally." (*Id.*) However, in context, the references to Harley Owners' and Harley Riders' rallies do not amount to unfair competition. The leaflets as a whole do not create an impression that TQSI cruises are sponsored by Harley. For instance, on the bottom of the leaflet for the first cruise, the contact information states that the organizers are Dean & Debbie Anderson, *Independent Cruise Specialists.* (*Id.*) (emphasis added). Additionally, TQSI's logo – which has zero

8

resemblance to Harley's logo – is displayed prominently on every page. (*Id.*) Further, at the bottom of the leaflet for the first cruise are over a dozen vendor logos, with the Harley logo among them. (*Id.*) All vendor logos are much smaller than TQSI's and far removed from the front-and-center TQSI logo, sending a clear message that TQSI is not affiliated with any of the vendors, including Harley. (*Id.*) The leaflet for the second cruise displays prominently TQSI's logo and has its web address and phone number on the bottom. (*Id.*)

Further, plaintiffs attached to their complaint printouts of defendant's web pages promoting the first and second annual cruise rallies. (Compl. Exs. 15 and 16.) The "About Us" page for the first cruise – dated September 30, 2003 – tells the story of Dean and Debbie Anderson, how they came up with the idea of a motorcycle cruise, and what awaits cruise passengers on board. (*Id.* Ex. 15.) The signature of the bottom of the page reads "Dean and Debbie Anderson" and states their Virginia address and phone number. (*Id.*) This effort by the Andersons is sufficient to comply with unfair competition law even without a disclaimer of a Harley affiliation.

As to TQSI's second annual cruise,[4] its FAQ web page contains an explicit disclaimer that TQSI is affiliated with Harley. (*Id.* Ex. 16.) Additionally, the "Giveaway" page states that a 2003 giveaway motorcycle was donated by Dean and Debbie Anderson. Further, the "Grand Prize Motorcycle" section states, "For the 2004 Hog On The High Seas Rally we are trying to determine what motorcycle we (Dean & Debbie) will be purchasing for this years (sic) giveaway. It could be the 2003 Harley-Davidson Road King Custom Pictured below." (*Id.*) According to this statement, (1) the Andersons decide what

---

[4] The first web page for the second cruise reads on the bottom "Last Update March 08, 2004" – almost three months before Harley sued TQSI. (Compl. Ex. 16.)

9

motorcycle to give away; (2) the Andersons had to *purchase* the motorcycle; and (3) the motorcycle *may* be a Harley. Presumably, at the very least, Harley would not have to purchase its own motorcycle for a giveaway. This example demonstrates that Dean and Debbie Anderson, and not Harley, are behind "Hogs on the High Seas" rally.

Additionally, plaintiffs cite exhibits 56 and 57 to Dean Anderson's deposition for the proposition that defendant's disclaimers were added only after Harley sued TQSI. (Pls.' Resp. to DPFOF ¶ 31.) A review of exhibit 56 – a printout of a TQSI web archive from 2003 (the suit was filed in 2004) – has an explicit disclaimer that defendant is not affiliated with Harley or Harley Owners' Group.[5] Additionally, several of defendant's exhibits dating prior to the filing of the suit disclaim any affiliation with plaintiffs. (Def.'s Exs. in Supp. 32 at 28-29; 33 at 26-27.) Thus, (1) contrary to Harley's assertion, TQSI disclaimed an affiliation with Harley *before* Harley sued TQSI; and (2) defendant has done enough to comply with unfair competition law.

Finally, plaintiffs contend that defendant's marketing methods foster confusion about the origin of its services among the public. (Pls.' Br. in Supp. 16-19.) Plaintiffs add that defendant markets its cruises at Harley rallies and advertizes in magazines aimed at Harley enthusiasts. (*Id.* at 18 ¶¶ 6, 7.) But, defendant is free to target its most receptive audience. Rallies and publications for Harley enthusiasts are a fertile ground for defendant's efforts, because Harley enthusiasts are most likely to be interested in motorcycle rally cruises. Unfair competition law does not require defendant to employ

---

[5] Exhibit 56 is a "Frequently Asked Questions" section of defendant's website. The question is "Do I have to be H.O.G. member?" The answer is "No. This rally is not sponsored by Harley Owners Group, or Harley Davidson. Although we do have Local Harley Dealers sponsoring prizes for the rally."

10

ineffective marketing strategies. For example, defendant does not have to market its cruises at opera houses to comply with unfair competition law. Thus, defendant's marketing campaign does not amount to a false designation of origin of its services.

IV. Common Law Trademark Infringement and Unfair Competition Claims

Common law trademark infringement "is a branch of the law of unfair competition, and the principles used in both actions are substantially similar." *First Wis. Nat. Bank of Milwaukee v. Wichman*, 85 Wis.2d 54, 60 (1978). Because the court has already discussed the unfair competition claims, it need not discuss the topic further.

Therefore,

IT IS ORDERED that TQSI's motion for summary judgment is GRANTED.

Dated at Milwaukee, Wisconsin, this 31st day of August, 2006.

BY THE COURT

s/ C. N. CLEVERT, JR.
C. N. CLEVERT, JR.
U. S. District Judge

11